**CEMENT MASONS' PENSION FUND, LOCAL 502; Cement Masons' Institute of Chicago, Illinois Local 502; Cement Masons' Savings Fund, Local 502; and Cement Masons' Apprentice Educational and Training Trust Fund, Local 502, Plaintiffs,**

v.

**DUKANE PRECAST, INC., a domestic corporation, Defendant.**

No. 92 C 3880.

United States District Court,
N.D. Illinois, E.D.

May 21, 1993.

certain collective bargaining and trust agreements. Plaintiffs, Cement Masons' Pension Fund, Local 502; Cement Masons' Institute of Chicago, Illinois; Cement Masons' Savings Fund, Local 502; Cement Masons' Apprentice Educational and Training Trust Fund, Local 502 (collectively the "Funds"), brought this action under Section 301 of the National Labor Relations Act, 29 U.S.C. § 185(a) ("NLRA"), and Sections 502 and 515 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1132, 1145 ("ERISA"), against Dukane Precast, Inc. ("Dukane"), an Illinois corporation with its principal place of business in Naperville, Illinois. The plaintiff Funds are all employee benefit plans and trusts with their principal places of business in Illinois. Defendant, Dukane, is in the business of precasting concrete products for commercial and industrial buildings.

Before the court is Dukane's motion for summary judgment. On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir.1989). Summary judgment is appropriate only where there is "no genuine issue as to any material fact" and movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Whether or not a fact is material is governed by substantive law. *Id.* The burden of establishing a lack of any genuine issue of material fact and entitlement to judgment as a matter of law rests on the movant. *Jakubiec v. Cities Service Co.*, 844 F.2d 470, 473 (7th Cir.1988). Summary judgment is not proper when there is a dispute over facts which might affect the outcome of the suit. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. The dispute must be genuine, that is, the party opposing the motion for summary judgment may not "rest on the mere allegations of his pleading, but must set forth specific facts showing there is a genuine issue for trial." *Id.* The nonmovant must also make a showing sufficient to establish any essential element for which it will bear the burden of proof at trial. *Celo-*

Hugh B. Arnold, Donald D. Schwartz, Arnold & Kadjan, Chicago, IL, for plaintiffs.

Steven H. Adelman, Michael James Mueller, Keck, Mahin & Cate, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

This is an action by several union pension funds for contributions allegedly due under

*tex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Dukane precasts its products at its plant in Aurora, Illinois, and ships them to the construction site. During production, shipment or erection, the precast concrete will often become chipped or cracked. Dukane employs between 70 and 105 employees during the height of the construction season. Of those, four "patcher" employees spend between 25% and 90% their time at the construction site with trowels and buckets of concrete, repairing, patching and finishing chips and other irregularities on the precast concrete products once they are in place. The Funds argue that under a collective bargaining agreement, contributions are owing for three of these four "patchers"[1] for work performed during the period January 1, 1989, through October 18, 1992.[2] Dukane argues the agreement relied on by the Funds is illegal and unenforceable.[3]

In 1981, Dukane signed a Pre-hire Agreement[4] presented by Cement Masons' Local 362. The Pre-hire Agreement was also individually signed by the 35 Illinois Cement Masons' Locals, including 362 and 502. The Pre-hire Agreement bound Dukane to the multiemployer collective bargaining agreements between certain employer associations and the Cement Masons. The Pre-hire Agreement only applied to one of Dukane's employees and required submission of reports on that employee's work time and remittance of fringe benefits contributions to the relevant Local's funds. During 1981 and 1982, Dukane submitted fringe benefit report forms for work performed by two of its employees.

In 1982, Local 362, its local funds, the Cement Masons' Institute of Chicago, Illinois, and others sued Dukane under the Pre-hire Agreement for enforcement on behalf of a member.[5] The parties settled and Dukane paid $2,500 to Local 362 and its affiliated funds. The settlement agreement states that Dukane "does not admit that it is covered by any collective bargaining agreement with Cement Masons Local 362 or any other Local of the Association or that it has any liability to the Funds for any reason whatsoever." Since the settlement in January 1984, Dukane has made no reports or payments to any Cement Masons' Local trust fund. Plaintiff Funds rely on the Pre-hire Agreement signed in April 1981 as the basis for Dukane's contribution liability. *See Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.,* 472 U.S. 559, 565, 105 S.Ct. 2833, 2837, 86 L.Ed.2d 447 (1985); *Wyoming Laborers Health & Welfare Place v. Morgen & Oswood,* 850 F.2d. 613, 621 (10th Cir.1988).

Ordinarily, the NLRA prohibits employers and unions from entering into collective bargaining agreements unless the union is backed by a majority of the relevant bargaining unit's employees. *See* NLRA §§ 8(a), (b), 29 U.S.C. §§ 158(a), (b). An exception to this requirement is NLRA § 8(f), 29 U.S.C. § 158(f), which allows certain employers and unions to enter into "pre-hire" agreements before the union achieves majority status.[6] This exception allows union representation in the building and construction industry where

---

**1.** The one "patcher" for whom the Funds are not seeking contributions is already covered under another union's plan.

**2.** Although none of the three patchers for whom the Funds seek contributions are members of any Cement Masons' Local, the parties assume Dukane would nonetheless be liable for contributions if a valid agreement existed. *See Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.,* 870 F.2d 1148, 1153 (7th Cir.1989).

**3.** The Funds argue defendant has waived this argument because it was not raised in earlier litigation with other Cement Masons' Locals which settled. The Funds have supplied no authority supporting such a proposition.

**4.** 29 U.S.C. § 158(f).

**5.** *Cement Masons' Pension Fund, Local 362, et al. v. Dukane Precast, Inc., et al.,* 82 C 4934 (N.D.Ill.).

**6.** NLRA § 8(f) provides: "[i]t shall *not* be an unfair labor practice ... for *an employer engaged primarily in the building and construction industry* to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization ... because (1) the majority status of such labor organization has not been established ... prior to the making of such agreement." 29 U.S.C. § 158(f) (emphasis added).

employment may be of a short duration and employers obtain employees on a project-by-project basis. *See Forest City/Dillon–Tecon Pacific*, 209 N.L.R.B. 867, 868–70 (1974). This exception is only available for an employer "engaged primarily in the building and construction industry." 29 U.S.C. § 158(f).

Many cases have dealt with the determination of whether a certain employer is "engaged primarily in the building and construction industry." *See e.g., Forest City*, 209 N.L.R.B. 867; 8 Theodore Kheel, *Labor Law*, § 40.04[1] (1987 & Supp. Jan. 1993) [hereinafter *Labor Law*] and cases cited therein. General contractors and subcontractors who perform their work at the construction site are engaged primarily in the building or construction industry. *See McLeod v. Local 3, IBEW (Derby Electric Corp.)*, 57 L.R.R.M. (BNA) 2052 (S.D.N.Y. 1964) (electrical contractors); *Barwise Sheet Metal Co.*, 199 N.L.R.B. 372 (1972). What is less clear is whether employers who sell and deliver building and construction products and who provide incidental construction site services are primarily engaged in the building and construction industry under § 8(f) and entitled to its exemption. *See 8 Labor Law, supra*, at § 40.04[1].

Absolute rules are difficult to draw from the heavily fact-laden cases on this issue. However, the touchstone of those cases involving products suppliers seems to be whether or not the supplier's revenues come from installation of the products at the jobsite. *See Central Arizona Dist. Council of Carpenters (Wood Surgeons, Inc.)*, 175 N.L.R.B. 390 (1969) (installation only a fraction of receipts); *Painters Local 1247 (Indio Paint and Rug Center)*, 156 N.L.R.B. 951 (1966) (93% gross revenues from installation and sale of floor coverings); *Frick Co.*, 141 N.L.R.B. 1204 (1963) (only 1% of income from installation of refrigeration equipment at construction site, not entitled to § 8(f)); *N.L.R.B. v. W.L. Rives Co.*, 328 F.2d 464, 468–69 (5th Cir.1964) (the statute does not exempt employers who manufacture and sell products subsequently installed by others at the construction site); *see also 8 Labor Law, supra*, at § 40.04[1]. *But see A.L. Adams Constr. Co. v. Georgia Power Co.*, 733 F.2d 853 (11th Cir.1984) (power company involved

in primarily nonconstruction industries entitled to § 8(f) exemption where it was building its own power plant).

Dukane argues that it neither installs nor participates in the erection of its products at the construction site. Dukane also argues that, notwithstanding the characterization of the construction site work performed by its patchers, Dukane is not engaged "primarily" in the building and construction industry.

The Funds only seek contributions for three of the four patchers whom the Funds claim spend a substantial portion of their day performing cement masons' work at construction sites. The Funds argue that the three patchers do participate in the installation and erection of the products at the construction site. In addition to the cosmetic patching work performed, the Funds note that at the construction site, the patchers may insert steel plates used in connecting the precast to the superstructure. At deposition, patcher Timothy Hart testified that the steel plates used to connect the precast are normally installed when the precast is manufactured, but that if the plates are missing or need to be added, the patcher will perform this work at the construction site also. Hart dep. pp. 36–37. The field work performed by the field patchers comprises between 2% and 3% of Dukane's labor and material costs. (Ripper affid. ¶ 5). Dukane does not bill its customers for repair work performed by the patchers. Any repair work is part of the cost of the finished product to the customer. Def. 12(m) ¶ 8.

Even construing all facts and inferences in favor of the Funds, Dukane is not "engaged primarily in the building and construction industry" for purposes of § 8(f). Although the Funds argue that the four patchers are primarily engaged in field construction, the statute requires that the employer itself be primarily so engaged. *See Operating Engineers Pension Trust v. Beck Engineering & Surveying Co.*, 746 F.2d 557, 562 (1984). "[A]n employer whose involvement in construction work is only a negligible part of his business is not entitled to enter pre-hire agreements." *Id.* Even if the patchers are considered to be doing "construction" work, plaintiffs have not shown that there is a

genuine issue of material fact as to whether their work is more than a very small fraction of Dukane's business incidental to the sale of its precast products.

The N.L.R.B. has determined that precast cement manufacturers who deliver their product to the construction site and do patching work there are not "engaged primarily in the building and construction industry." *See Forest City,* 209 N.L.R.B. at 870. In *Forest City,* a rival union challenged the § 8(f) prehire agreement entered into by Forest City, a precast concrete company. The Board's opinion examined Forest City's operations at its precast concrete plant, despite the fact that the larger company also performed architectural, general and subcontracting work. After an extensive review of the legislative history surrounding § 8(f), the Board determined that the precast company, with business operations almost identical to Dukane's, was not entitled to the exemption despite the fact that certain employees might do patching or repair of construction already completed. *Forest City,* 209 N.L.R.B. at 868. The *Forest City* Board rejected a broad interpretation of § 8(f) to include any employer "connected with/or a part of the building and construction business." The Board determined that the statute only applied to manufacturers whose employees "are working essentially in construction or related work, ... installing [product] ... [but that] it does not apply to an employer who has only a negligible involvement in the actual *construction process.*" *Id.* at 870 (emphasis added). The Funds fail to show any meaningful distinction between Forest City and Dukane.

Dukane and the Funds argue Dukane's operations are similar to asbestos removal, which has been held to be subject to § 8(f). *See U.S. Abatement,* 303 N.L.R.B. 73 (1991). *U.S. Abatement* is inapposite because the asbestos work involved is performed almost entirely at the building site, unlike the manufacturing done by Dukane.[7] Because Dukane is not engaged primarily in the building and construction industry, it is not entitled to enter into pre-hire agreements such as the

1981 Pre-hire Agreement with all 35 Cement Masons' Locals.

■ The parties have failed to address one very important aspect of defendant's illegality defense; whether it is a valid defense to an ERISA claim. Congress added § 515 to ERISA in 1980, 29 U.S.C. § 1145, in an effort to eliminate many contract defenses involving formation and course of performance that significantly complicated pension fund collection cases. *See Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.,* 870 F.2d 1148, 1152–56 (7th Cir.1989). Pension and welfare plans are like third-party beneficiaries of the collective bargaining and participation agreements. *Id.* at 1151. The Seventh Circuit has interpreted the text of § 515, that such promises are enforceable "to the extent not inconsistent with law," strictly. "Defenses based on fraud in the inducement, oral side agreement[s], course of performance, want of consideration, [and] failure of the union to have majority support" are not cognizable defenses to an ERISA claim. *Id.* at 1154 (rejecting employer's defense that the employer and local union had an oral agreement different from the written agreement). The Seventh Circuit's decision in *Central States* makes employer liability in ERISA collection cases tantamount to strict liability. *Id.* at 1153 ("Whether or not the plans are obligated to Gerber Truck's workers, nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement."); *see also id.* at 1157–58 (Cudahy & Wood, JJ., concurring in part and dissenting in part). *Compare Martin v. Garman Construction Co.,* 945 F.2d 1000, 1004–06 (7th Cir.1991) ("Defenses to the validity of a labor contract and liability under ERISA's section 515 present distinct issues.").

This court has not found any case law addressing the specific issue of whether an employer who is not "engaged primarily in the building and construction industry" may

---

7. The Funds also argue that the Office of Management and Budget's Standard Industrial Classification (SIC) Manual classifies Dukane's operations as construction. However, the SIC manual also classifies Dukane's operations as manu-

facturing. In short, the Funds' argument does not justify a departure from the Board's determination in *Forest City,* nor does it support the Funds' position.

nonetheless be liable under a § 8(f) pre-hire agreement for ERISA contributions. *But see Mo–Kan Teamsters Pension Fund v. Creason,* 716 F.2d 772, 775 (10th Cir.1983) (district court determined that employer was not in building and construction industry but also that the agreement was not a pre-hire agreement). In *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 79–83, 102 S.Ct. 851, 857–59, 70 L.Ed.2d 833 (1982), an action to collect pension contributions, the Supreme Court held that illegality of the § 8(e) hot-cargo agreement under the Sherman Act and the NLRA was a valid defense to the ERISA claim. Although the *Kaiser* funds argued that "employers' contributions to union welfare funds are not, in themselves and standing alone, illegal acts and that ordering [defendant] to pay would therefore not demand conduct that is inherently contrary to public policy," *id.* at 79, 102 S.Ct. at 857, the Court noted that the payment and amount of the contributions themselves were tied to conduct which violated the Sherman Act. In the *Kaiser* case, the Court determined that it was the payment of the contributions which was illegal under the Sherman Act because the amounts of those payments were tied to restrictions in coal purchase agreements. *Id.* at 79–82, 102 S.Ct. at 857–59. Therefore, the court upheld defendant's illegality defense.

In this case, however, the agreement to make pension contributions was independent of the illegal recognition of the Cement Masons' Locals as the bargaining representatives of the patchers. Recognition of the agreement's obligation to make contributions does not involve recognition of the Union as the employees' bargaining representative. Having ignored this issue, Dukane has not shown how recognition of the *contribution* obligation is inconsistent with the law. *See id.* at 86, 102 S.Ct. at 861 (the illegality defense must not be to a collateral matter, but must go to the portion of the contract for which enforcement is sought). Therefore, the fact that Dukane is not primarily engaged in the construction and building industry has not been shown to be a defense to this ERISA action and summary judgment

based on the illegality of the Pre-hire Agreement will be denied.

■ Dukane next argues that it repudiated the Pre-hire Agreement in a number of ways, relieving it of any contribution obligations. The law had been that an employer could unilaterally repudiate a § 8(f) agreement at any time prior to the union's achieving majority status. *See Jim McNeff, Inc. v. Todd,* 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1963). In *John Deklewa & Sons, Inc.,* 282 N.L.R.B. 1375 (1987), *aff'd sub nom. Iron Workers v. NLRB,* 843 F.2d 770 (3d Cir.), *cert. denied,* 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988), the board changed its interpretation of § 8(f). Under *Deklewa,* an employer may no longer unilaterally repudiate the agreement unless the collective bargaining agreement has expired or until the employees vote to reject or change their representative. The *Deklewa* decision purported to apply retroactively and the Seventh Circuit has upheld its retroactive application. *See NLRB v. Bufco Corp.,* 899 F.2d 608 (7th Cir.1990).[8]

Defendant argues that it repudiated the Pre-hire agreement in three different ways. First, Dukane argues that during the litigation of the 1982 suit by Local 362, Dukane repudiated the agreement by letter of March 7, 1983 to Local 362 notifying it that Dukane was terminating the Pre-hire agreement when the underlying collective bargaining agreement expired on May 31, 1983. Secondly, Dukane argues it repudiated the Pre-hire agreement in the January 31, 1984 settlement agreement, to which Cement Masons' Institute of Chicago, Illinois was a party, and that this served to repudiate the agreement as to all the Locals of the Operative Plasterers' and Cement Masons' International Association. Finally, Dukane argues that its conduct of not paying wages set forth in the Cement Masons' contract, not paying benefits or sending Trust Fund reports to the Funds, not participating in negotiations with any Local, and not contacting the Union requesting employees since May

---

**8.** Plaintiff's answer brief takes the position that under the law applicable to this case, a signatory contractor may repudiate a valid and enforceable

§ 8(f) contract prior to the union's attaining majority status. However, under *Bufco,* this may not be a correct statement of the applicable law.

31, 1983 constitutes a repudiation of the Pre-hire Agreement.

The Board determined in *Deklewa* that "upon the expiration of such [§ 8(f) agreements], the signatory union[s] will enjoy no presumption of majority status, and either party may repudiate the 8(f) bargaining relationship." There is a genuine issue of material fact as to whether the three forms of repudiation claimed by Dukane did or reasonably should have put Local 502 on notice of the repudiation.[9] Dukane argues that Local 502 must have known of the 1982 litigation because half of Local 502's officers are funds trustees. However, this unsupported argument does not necessarily mean that those officers were involved with the 1982 litigation or that they knew of Dukane's repudiation. Summary judgment is therefore inappropriate.

IT IS THEREFORE ORDERED that the motion of defendant Dukane Precast, Inc. for summary judgment [31] is denied.

---

**9.** This may seem like an anomalous situation. The agreement is an invalid § 8(f) pre-hire agreement because Dukane is not primarily engaged in the construction and building industry, and therefore not enforceable by the Unions themselves. However, whether or not it was properly repudiated as to the Unions, especially Local 502, is relevant to whether the agreement's obligation to the Funds continued in force for purposes of the Funds' action.